# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CALVIN WILLIAMS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 08-3726** |
| **BURL CAIN, WARDEN** | **SECTION "F"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE**.

# **PROCEDURAL HISTORY**[1]

On August 30, 2001, the St. Charles Parish District Attorney filed a bill of information charging petitioner, Calvin Williams, with armed robbery, a violation of LSA-R.S. 14:64. Petitioner was arraigned the same day and entered a plea of not guilty.

Petitioner filed various pre-trial motions, including motions to suppress the confession and identification, and a *pro se* motion to quash the bill of information. On September 18, 2002, the trial court heard and denied the motion to suppress the identification and the motion to quash. On December 12, 2002, the court heard and denied the motion to suppress the confession.

On January 13, 2003, the State amended the bill of information to remove the name of one of the three alleged victims, and to change the spelling of another victim's name. Petitioner was arraigned as to the amended bill and entered a plea of not guilty.

Petitioner was tried by a twelve-person jury on January 21 and 22, 2003 in the Twenty-Ninth Judicial District Court for the Parish of St. Charles. The jury returned a verdict of guilty as charged. On August 27, 2003, the trial court sentenced petitioner to seventy years at hard labor, without benefit of parole, probation or suspension of sentence. The judge ordered that the sentence run consecutively to a sentence petitioner was already

---

[1] A portion of the procedural history was taken from the Louisiana Fifth Circuit Court of Appeal's opinion, *State v. Williams*, 889 So.2d 1135, No. 2004-KA-0697 (La. App. 5 Cir. 2004).

serving for a Jefferson Parish conviction. The judge imposed an additional two-year term of imprisonment under LSA-C.Cr.P. art. 893.3, based on petitioner's possession of a firearm at the time of the offense. The judge ordered that the two years be served consecutively to the seventy-year sentence. Petitioner made an oral motion for appeal, and filed a written appeal motion on September 4, 2003. The judge granted an appeal on September 4, 2003.

On November 30, 2004, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and his seventy-year sentence. The court, however, vacated the two-year sentence imposed pursuant to LSA-C.C.P. art. 893.3. *State v. Williams*, 889 So.2d 1135, No. 2004-KA-0697 (La. App. 5 Cir. 2004). On May 13, 2005, the Louisiana Supreme Court denied petitioner's writ application. *State v. Williams*, 902 So.2d 1017, No. 2005-KO-0395 (La. 2005).

Following the conclusion of his direct appeal proceedings, petitioner sought post-conviction relief, raising the same claims that he raises in the instant federal habeas application.[2] The state district court denied petitioner's post-conviction application on May 8, 2007.[3] On June 28, 2007, the Louisiana Fifth Circuit Court of Appeal, finding that petitioner's application failed to disclose error in the trial court's adverse decision, denied petitioner relief. *Williams v. Cain*, No. 2007-KH-0410 (La. App. 5 Cir. 2007) (unpublished

---

[2] A copy of petitioner's post-conviction application is contained in the State rec., vol. 5 of 5.

[3] A copy of the state district court's Order denying petitioner post-conviction relief is contained in the State rec., vol. 5 of 5.

opinion).[4] Petitioner's effort in this regard culminated on May 9, 2008, when the Louisiana Supreme Court denied his writ application. *State ex rel. Williams v. State*, 980 So.2d 686, No. 2007-KH-1703 (La. 2008).

On May 23, 2008, petitioner filed the instant federal habeas corpus application. Petitioner raises the following claims: 1) He was denied effective assistance of counsel due to a "conflict of interest" between himself and appointed counsel; and, 2) he was denied effective assistance of counsel due to counsel's failure to assert an insanity defense. In its response, the State concedes that petitioner's habeas application is timely and does not contest the fact that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, the court shall proceed to address the merits of petitioner's claims following its review of the pertinent facts and applicable standard of review.

**FACTS**[5]

On the morning of August 28, 2001, Tammy Capitano, Jennie Fasullo, and Christie Hebert were among the employees working at the Boutte branch of First National Bank. Diedre Wildmon was the only customer in the bank. Fasullo testified that the bank

---

[4] A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 5 of 5.

[5] The facts are taken from the Louisiana Fifth Circuit Court of Appeal's opinion, *State v. Williams*, 889 So.2d 1135, No. 2004-KA-0697 (La. App. 5 Cir. 2004).

4

opened at 9:00. Soon thereafter, Fasullo was in the back of the bank using a coin counting machine, and petitioner approached her from behind. Petitioner grabbed her and said, " 'You f-in bitch, go get me some money.' " Fasullo testified that petitioner had a gun, and she feared for her life. Wildmon testified that petitioner pointed his gun at the tellers' heads.

Fasullo testified that she walked with petitioner to her teller station. Capitano opened the money drawer, and she and Fasullo gave petitioner the money in the drawer. Petitioner directed Fasullo to put the money into a brown zippered bag. Fasullo did as petitioner ordered. She also put dye packs into the bag, which were intended to mark the stolen money. Petitioner continued to shout obscenities at the women. He demanded that the employees give him more money. Fasullo told him she did not have any more cash at her station. Petitioner grabbed Fasullo again and forced her to move to the next teller window. Fasullo opened the drawer and gave him the money inside the drawer.

Petitioner left the bank with the money and began running. Fasullo testified that she could not see him get into a vehicle. Following bank procedure, Fasullo locked the front door. She and the other women in the bank filled out witness forms describing the incident and the perpetrator.

Sergeant Billy LeBlanc of the St. Charles Parish Sheriff's Office testified that he received a dispatch regarding the bank robbery between 9:15 and 9:30 a.m. on August 28, 2001. He got into his patrol unit and headed for the bank. LeBlanc was stopped at a traffic

light when he saw a car exit Interstate 310 and head downriver on Louisiana Highway 18 at a high rate of speed. The car fit the broadcast description of the car involved in the robbery. LeBlanc followed the car, a brown Chrysler Fifth Avenue, keeping it in sight.

LeBlanc testified that the Chrysler left the road, went into a grassy area, returned to the road, and crossed in front of traffic. The car then went onto the levee to bypass some slow-moving traffic. When it got back onto the road, it hit another car. It left the road again, and came to a stop after having rolled onto its side. Petitioner was the car's driver and only occupant.

LeBlanc testified that there was money lying on the ground and inside the car. A gun was found inside the car. Detective Sergeant Rodney Madere, who was also involved in stopping petitioner, testified that the money in petitioner's car was covered in red dye. Officers arrested the petitioner at the scene of the accident. Deputy Dave Guizzardi testified that he found a dye-stained bag of money on the ground on Breaux Street, near the bank.

Detective Donnie Smith headed the investigation at the robbery scene. He testified that he was at the bank for one and one-half to two hours interviewing witnesses. Detective Smith testified that he showed photographic lineups to Capitano, Fasullo and Wildmon on August 29, 2001. All three women identified petitioner as the bank robber. Detective Smith further testified that teller Christy Hebert was shown a photographic lineup, and that she tentatively identified petitioner as the perpetrator. Capitano, Fasullo and

Wildmon positively identified petitioner in court as the bank robber. Mike Guillot, First American Bank's security director, testified that most of the stolen money was recovered, and that the bank lost a total of $165.00.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant

> relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## ANALYSIS

### Ineffective Assistance of Counsel

The seminal case for adjudicating a habeas petitioner's ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), which places on petitioner the burden of demonstrating not only that his counsel's performance was deficient, but also that he was prejudiced as a result of counsel's deficient performance. If a court finds that a petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong. *Id*.

Under the deficient performance prong of the *Strickland* test, "... it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993),quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. A counsel's decision regarding whether to place a criminal defendant on the witness stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985). "'An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996), quoting *United States v. Acklen*, 47 F.3d 739, 742 (5th Cir. 1995), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 893 (1997). To prove prejudice under the *Strickland* standard, a petitioner "... must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner complains that his right to effective assistance of counsel was violated by virtue of the trial court's refusal to appoint new counsel to represent him due to the alleged "conflict of interest" that existed between himself and appointed counsel. As a review of the trial transcript reflects, on the morning of trial, before prospective jurors entered the courtroom, petitioner presented a note to the court advising that he wanted to

9

"fire" his attorney.[6] Thereafter, petitioner set forth the following reasons for wanting to discharge his counsel. First, petitioner complained that counsel "refused to call any of my witnesses." Second, petitioner stated that counsel "never came to see me to properly prepare for trial." Third, petitioner said that his attorney "lies, telling me that I told him things that I didn't tell him."[7] Petitioner also complains that counsel did not allow him to testify at trial.[8] Additionally, petitioner did not appreciate his counsel's blunt assessment of his trial prospects, complaining that counsel informed "that the jury is going to convict me" and that "I've been playing games with the Court from the day I was arrested and that today they're going to play games with me and I'm going to be serving a lot of time."[9]

After petitioner was allowed to set forth the basis of his claim that he and his counsel had conflicting interests and, as such, he should be allowed to fire his attorney, defense counsel, Mark Marino, was asked if he "want[ed] to respond to Mr. Williams [sic] allegations."[10] Counsel did so, stating that he had spoken with petitioner on several occasions and recommended that petitioner, based upon the "insurmountable" evidence

---

[6] State rec., vol. 3 of 5, trial transcript at p. 284.

[7] State rec., vol. 3 of 5, trial transcript at pp. 287-288.

[8] Rec. doc. 1, petitioner's memorandum at pp. 10-11.

[9] State rec., vol. 3 of 5, trial transcript at p. 288.

[10] State rec., vol. 3 of 5, trial transcript at p. 291.

10

against him, enter into an agreement pursuant to which, in exchange for his plea of guilty, petitioner would be sentenced to twenty years incarceration. Counsel explained:

> I have the right to make that recommendation to my client. I'm not illiterate. I'm not stupid. I'm not foolish. I know what a jury is going to do in this case. But, that doesn't mean that I'm not going to give him the best possible defense that he's entitled to under the constitution.
>
> The Court is aware that I believe in that. I believe in his right to that. But, I also am not foolish enough to believe that no matter what I do, that I can overcome two individuals who are going to identify personally this man as the individual who committed the armed robbery.
>
> In addition to that, there's a witness who is going to testify that a couple of days or a day before that he saw the vehicle casing the joint.
>
> In addition to that, Your Honor, the other evidence involved in this case is that he was caught in the vehicle relatively soon after the incident, half an hour, fifteen minutes after the incident with the money, the gun, the red dye in the car, a black - - - he didn't have his shirt on - - - the black shirt that the people identified was laying next to the vehicle. All of that evidence makes my recommendation to him to take the deal I think justifiable under the circumstances.
>
> In fact, I would be remis[s] in my duties if I didn't give him that advise [sic].

BY THE COURT:
> And that was after a high speed chase that they obtained all that evidence, correct?

BY MR. MARINO:
> Yes, sir.

BY THE COURT:
> And there was no other individual found in the car?

BY MR. MARINO:

    No other individual found, seen, or believed to be there, contrary to what my client's assertions are that he was carjacked and someone else went into the bank.[11]

Following the above colloquy, petitioner commenced hollering, insisting that he be provided with a new lawyer, at one point becoming violent, lunging at defense counsel and making physical contact with him.[12] As a result, the court had petitioner gagged, then removed from the courtroom, and subsequently provided a curative instruction to prospective jurors.[13]

With regard to petitioner's claim that counsel was ineffective due to his failure to call any of petitioner's witnesses, it is well-established that the failure to contact witnesses is not *per se* prejudicial to the point of warranting habeas relief. *See Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("complaints of uncalled witnesses are not favored, [in federal habeas review] because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative"). In *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985), the Fifth Circuit noted that for a petitioner to show prejudice under *Strickland*, he must show that the

---

[11] State rec., vol. 3 of 5, trial transcript at pp. 293-295.

[12] State rec., vol. 3 of 5, trial transcript at pp. 295-299.

[13] State rec., vol. 3 of 5, trial transcript at pp. 300-301; 303-304.

testimony of the witnesses would have been favorable and that the witnesses would have testified at trial. Petitioner must show a reasonable probability that the uncalled witnesses would have made a difference in the result. *Alexander*, 775 F.2d at 603. There is a strong presumption that the failure of petitioner's counsel to call witnesses is a strategic choice. *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66 (1984).

In this case, not only has petitioner failed to demonstrate what testimony the uncalled witnesses would have offered and that they would have testified, he has failed to set forth the identity of the uncalled witnesses. Clearly, petitioner has failed to satisfy his burden of proof in this regard.

As for petitioner's claim that he was denied his right to testify at trial, "[a] criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709-10, 97 L.Ed.2d 37 (1987), to be implicit in the Fifth, Sixth and Fourteenth Amendments." *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991) (citations omitted); *see also White v. Cain*, 2006 WL 3703240, *4 (E.D. La. Dec. 11, 2006). A habeas petitioner, however, has the burden of proving that he was denied this constitutional right. As the court explained in *Turcios v. Dretke*, 2005 WL 3263918, *6 (S.D.Tex. Nov. 29, 2005), "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney

forbade him from taking the witness stand. *Underwood v. Clark,* 939 F.2d 473, 475-76 (7th Cir. 1991)." The *Underwood* court specifically noted the potential problem posed if a habeas petitioner, arguing that counsel unconstitutionally denied him his right to testify, is not required to satisfy his burden of proof.

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." That's what Underwood did. His affidavit, which is the only evidence bearing on the question, states, so far as pertinent here, "I was denied the opportunity to testify at my own trial in that I told my attorney that I wished to testify on my own behalf. My attorney told me I could not testify."
>
> We agree with the First Circuit's ruling in *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir. 1987), that this barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary-and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify-to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Underwood*, 939 F.2d at 475-76.

In the instant matter, not only is there no evidence to prove petitioner's claim other than his statement to the effect that he was not allowed to testify, the trial minutes refute petitioner's claim. Specifically, the trial minutes from January 22, 2003, the second

14

day of testimony, reflect that defense counsel advised petitioner to testify but petitioner, when questioned by the court as to whether he wanted to take the stand, responded that he did not wish to testify.[14]

As with petitioner's claim that he was not allowed to testify, his remaining claims, that his counsel never came to see him to properly prepare him for trial and that his counsel lied about what he said, are also unsupported. Petitioner provides nothing but his unsubstantiated statements. Further, petitioner provides no argument with respect to what would have changed, i.e., how his trial proceedings would have differed, by virtue of more prison visits from counsel, or how he was prejudiced by counsel's alleged lies regarding his statements. Again, petitioner has clearly failed to satisfy his burden of proof.

Petitioner also complains that counsel was ineffective due to his failure to present a defense based upon petitioner's alleged insanity at the time he committed the armed robbery. Petitioner argues that counsel should have known that he was insane when he turned down an offer to plead guilty in exchange for a 20-year sentence, opting instead to go to trial with the "bogus" defense "that he was car jacked by an unknown black male, forced to wait in the parking lot until the robbery took place, and then ordered to drive the getaway car." Thereafter, the car jacker got out of the car at a Shell station and petitioner, following

---

[14]*See* State rec., vol. 1 of 4, trial minutes at p. 8.

a high speed chase and wreck, was apprehended by police "while he was on his way back to the bank to return the money."[15]

Petitioner further submits that counsel should have raised an insanity defense based upon the fact that he "informed [counsel] on more than one occasion that he had a mental health history, had not been taking his medications, and that he had been seen by a Sanity Commission composed of Dr. Richard Richoux and Dr. Rafael Salecedo in Jefferson Parish on an unrelated charge of distribution of cocaine...."[16] Additionally, petitioner states that he "told counsel that he had been hospitalized and records of his diagnosis as a chronic paranoid schizophreni[c] were available at East Lake Hospital, Depaul Hospital and New Orleans General Hospital" and, "that an independent doctor by the name of Dr. Fred Sautter had evaluated him on August 28, 2002, and determined that he was suffering extreme paranoia and needed further evaluation."[17]

As noted above, petitioner has the burden of proving counsel was deficient and that he was prejudiced by counsel's deficiency. To satisfy this burden, petitioner has provided this court with only his unsupported assertions that he has a long history of mental health problems, that various hospital records, along with a report from Dr. Fred Sautter,

---

[15] *See* Rec. doc. 1, petitioner's memorandum at pp. 14-15.

[16] *See* Rec. doc. 1, petitioner's memorandum at p. 15.

[17] *See* Rec. doc. 1, petitioner's memorandum at p. 16.

16

support his claim of mental instability, and that he provided all of this information to counsel. The only documentation of petitioner's alleged mental instability comes in the form of court records associated with petitioner's August, 2002 distribution of cocaine conviction in the Twenty-Fourth Judicial District Court for the Parish of Jefferson. In that case, defense counsel did present the argument, based in part upon Dr. Fred Sautter's evaluation, that petitioner was not mentally capable of proceeding to trial. However, as the Louisiana Fifth Circuit explained, in affirming petitioner's drug conviction, counsel's argument in this regard was without merit.

> First, the [petitioner] contends that the trial judge erred on the day before trial, in refusing to grant his motion to order a sanity commission to determine his competency to stand trial. He claims that a report by Dr. Sautter, a psychologist who evaluated him prior to trial, indicated that he exhibited moderately severe signs of paranoia and was in need of further evaluation. The [petitioner] alleges that Dr. Sautter's report was sufficient to demonstrate that he was unable to assist in his defense.
>
> The record shows that the [petitioner] actually filed three motions to appoint a sanity commission. The first motion was filed on February 14, 2001 by his [Indigent Defender Board] IDB attorney, Michael Somoza. A hearing was held on that motion on May 9, 2001. The [petitioner] was represented by private counsel, Derrick Shepherd at the hearing. A transcript of the hearing is not contained in the record, but the minute entry reflects that the parties stipulated to a report of April 19, 2001, which concluded that the [petitioner] lacked the capacity to understand the proceedings against him and to assist in his defense. The report recommended that the [petitioner] receive outpatient legal-rights education. The minute entry also shows that the hearing was continued at the request of the parties. On the next hearing date, September 27, 2001, the [petitioner] failed to appear for trial and an attachment was issued.

17

A second motion for a sanity commission was filed on January 15, 2002. During a hearing on May 15, 2002, the parties stipulated to **a report dated April 3, 2002 by Dr. Rafael Salecedo and Dr. Richard Richoux, in which the doctors opined that the [petitioner] was competent to proceed to trial.** The doctors noted in their report that the [petitioner] had previously been found to be incompetent and that competency restoration services were recommended. The report noted that the [petitioner] received the recommended services. The trial judge adopted the doctors' recommendation and found the [petitioner] competent for trial.

A third motion for a sanity commission was made in open court on August 28, 2002, the day before trial. The trial judge denied the [petitioner's] oral motion stating, "I'm not going to order another sanity hearing based upon what you told me about [petitioner]." Thereafter, on the same date, the [petitioner] filed a written motion for a sanity hearing and attached the report of Dr. Fred Sautter. The next day, prior to the commencement of trial, defense counsel again argued for the appointment of a sanity hearing based on Dr. Sautter's August 28, 2002 report. The [petitioner] argued that Dr. Sautter's finding that he had moderately severe paranoia and needed further evaluation, warranted the appointment of a sanity commission.

The trial judge denied the motion noting that the [petitioner] had already been examined by two trained psychiatrists who found him able to understand the proceedings and assist in his own defense. The trial judge further stated that Dr. Sautter was a psychologist who merely conducted a brief interview with the [petitioner] and noted only that the [petitioner] may or may not have certain psychological conditions. The trial judge explained that whether the [petitioner] had psychological problems was not the issue and stated:

> I'm certain that many defendants that go to trial have psychological problems, psychological issues, including those mentioned in this report. But as long as they don't interfere with his ability to understand the proceedings against him, his ability to assist his attorney and understand what's going on, then they would not rise to the level to cause me to grant the action requested by the Defense....

In the present case, Dr. Sautter's report does nothing more than recommend further evaluation.... [Petitioner] was uncooperative during the

latest evaluation and refused to complete the psychological test that Dr. Sautter attempted to administer. This conduct prevented the doctor from making a psychiatric diagnosis. Although Dr. Sautter noted that the [petitioner] appeared psychotic at the time of the interview due to extreme paranoid tendencies, he never expressed the opinion that the [petitioner] lacked the understanding to proceed to trial. To the contrary, Dr. Sautter stated that the [petitioner] communicated effectively during the interview and exhibited no thought disorders. Although Dr. Sautter's report also noted that the [petitioner's] distrustfulness would likely interfere with his ability to collaborate with his attorney during the defense process, nothing in the report indicates that the distrustfulness was anything more than manipulative behavior. Dr. Sautter's report merely found that the [petitioner] may or may not have certain psychological conditions. It does not raise a reasonable doubt as to the [petitioner's] mental capacity to proceed to trial. **The [petitioner's] distrust of his court-appointed attorney does not render him incompetent. Furthermore, there was nothing in the report to contradict the previous sanity report that found the [petitioner] capable of assisting in his own defense.**

*State v. Williams*, 866 So.2d 1003, 1006-1009, No. 2003-KA-0942 (La. App. 5 Cir. 2004) (emphasis added) (footnotes omitted).

Based upon the above, the court finds that petitioner was not prejudiced by counsel's alleged deficiency in failing to present, on petitioner's behalf, an insanity defense. Petitioner has not presented sufficient evidence reflecting that it is reasonably probable that had such a defense been presented, it would have been successful, thereby rendering a different result in connection with his trial proceedings.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[18]

New Orleans, Louisiana, this __28th__ day of _____January_____, 2010.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[18]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.